**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>JESUS ANTONIO VELARDE-OZUNA,<br>et al.,<br><br>        Defendants. | No. CR 10-754-TUC-CKJ<br><br>**ORDER** |

       Pending before the Court is Defendant Jesus Antonio Velarde-Ozuna's Motion to Suppress Wiretap Evidence (Doc. 398). Defendants Oscar Ibarra-Valdez, Miguel Torralba-Mendia, Miguel Torres-Organiz, Serapio Flores-Bahena, Eusebio Arce-Padilla, and Jose Lorenzo Mendez have filed Motions to Join (Docs. 399, 400, 401, 404, 405, and 412).[1] Argument was presented to the Court on September 12, 2011.

*Factual and Procedural Background*

       Information received by the Tucson Immigration and Customs Enforcement agents from a confidential informant ("CI") and sources of information ("SOI") led to an

---

[1] To the extent the Motions to Join have not been granted, *see* Doc. 419, the Court will grant the Motions to Join. Additionally, although the Court has granted the government's request to waive page limits, *see* Docs. 414 and 421, the request remains "pending" on the Court's CM/ECF. The Court will direct the Clerk of the Court to terminate the motion.

investigation into human smuggling activities of shuttle companies operating in Southern Arizona. The government asserts that, through the use of traditional investigative techniques, agents determined that aliens crossed into the United States and were brought to various target businesses in Tucson in this alleged alien smuggling organization ("ASO").[2] Universal Shuttles, Yamilet Shuttles, Superior Transportes/Linea Frontera, America's Shuttle Company, and Saguaro Roadrunner have operated public shuttle services in Arizona for many years. The government asserts that these businesses were target businesses.

On April 30, 2009, after approximately 4½ years of investigating this case, agents applied for and received authorization to intercept calls via a wiretap on the first of four target telephones, TT-1.[3] Five extensions were granted on TT-1. On June 10, 2009, the court authorized wire interceptions over TT-2, and subsequently authorized two extensions. On October 1, 2009, the court authorized wire interceptions over TT-3; no extensions were sought. On November 9, 2009, the court authorized wire interceptions over TT-4, with one extension.

On April 7, 2010, Defendants were indicted on one count of conspiracy to transport, harbor, and bringing aliens into the United States at a place other than a designated Port of Entry.[4] The indictment alleges that, from between August 2006, and April 6, 2010, Defendants were involved in a conspiracy to smuggle aliens from locations in Mexico, into the United States, through various shuttle businesses in Tucson, and ultimately to Phoenix-based stash houses. The indictment further alleges that Defendants

---

[2]Some of the traditional investigative techniques used included physical surveillance from August 2006 until December 2007; stationary pole cameras at Universal Shuttles and Superior Transportes/Linea Frontera installed in December 2008; a pole camera at America's Shuttles installed in mid-March 2009.

[3]The Court will adopt the government's designations of TT-1 – TT-4 to refer to the target telephones.

[4]A forfeiture allegation was also made.

1  used land lines and cellular phones to coordinate the smuggling of the illegal aliens into
2  and within the United States, payments for smuggling fees were made using MoneyGram,
3  Western Union, or various other bank and wire transfers, and the illegal aliens were given
4  pre-printed shuttle receipts denoting payment of $30.00 for transportation to Phoenix in
5  an attempt to make the shuttle trip appear to be legitimate transportation of individuals.
6  The indictment also alleges the use of various stash houses in Tucson, including shuttle
7  businesses and residences in Tucson and Nogales, Arizona and that the defendants
8  smuggled more than 2,000 illegal aliens during the conspiracy.

On July 7, 2011, Defendant Jesus Antonio Velarde-Ozuna filed a Motion to Suppress Wiretap Evidence (*Franks* Hearing Requested) (Doc. 398). Motions to Join have been filed; a response and a reply have been filed.

*Standing*

A defendant bears the burden of proving that he has standing to challenge the admissibility of evidence of intercepted conversations. *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *United States v. Singleton*, 987 F.2d 1444, 1447 (9th Cir. 1993). Indeed, the applicable statute states that an aggrieved person may move to suppress wiretap evidence. 18 U.S.C. § 2518(10)(a). An "aggrieved person" is a person "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. §2510(11).

A defendant lacks standing to complain about allegedly improper intercepted conversations of others. *See United States v. Ott*, 827 F.2d 473, 475 (9th Cir. 1987). "Thus a defendant may move to suppress the fruits of a wire-tap only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises." *United States v. King*, 478 F.2d 494, 506 (9th Cir. 1973), *citing Alderman v. United States*, 394 U.S. 165, 176, 176 n.9 (1969).

The government asserts that Arce-Padilla is the only defendant who has standing to question the wiretap of TT-1. In other words, the other defendants were not

intercepted on TT-1 and were not target subjects of that wire interception. The government also argues that a defendant may not avail himself of the "fruit of the poisonous tree" doctrine if he has not established standing. *United States v. Reyes-Bosque*, 596 F.3d 1017, 1031 n.5 (9th Cir. 2010).

It is not disputed that Mendez was not intercepted on any wiretap. The Court finds Mendez does not have standing to attack any wiretap.

Although the other Defendants assert their communications were intercepted by the wiretaps, it has not been shown that any Defendant other than Arce-Padilla was intercepted on TT-1. The Court finds Arce-Padilla is the only Defendant who may attack TT-1. *United States v. Arreguin*, 277 F.Supp.2d 1057, 1063 n. 12 (E.D.Cal. 2003), *United States v. Mercado*, 110 Fed.Appx. 19 (9th Cir. 2004) *unpublished*.

*Standard of Review*

An appellate court reviews an "issuing judge's decision that the wiretaps were necessary for an abuse of discretion." *United States McGuire*, 307 F.3d 1192, 1197 (9th Cir. 2002).[5] A district court evaluating a wiretap authorization in order to resolve a suppression motion applies the same standard of review. *United States v. Ai Le*, 255 F.Supp.2d 1132, 1133-34 (E.D. Cal. 2003); *see also United States v. Rivera*, 527 F.3d 891, 898 (9th Cir.2008), *citing United States v. Lynch*, 437 F.3d 902, 912 (9th Cir.2006) (en banc). More specifically:

> The court should give great deference to the decision of the judge who issued the order. In general, a district court's determination that a wiretap is necessary is reviewed for an abuse of discretion.
>
> The reviewing court reviews de novo the question of whether the application has contained a full and complete statement of facts concerning the inadequacy of other procedures and the necessity for interception, but reviews the issuing judge's determination of the inadequacy of other procedures deferentially, reviewing only for abuse of discretion, or clear error.

---

[5]The Motion to Suppress does not claim the initial affidavit or the extensions fail to establish probable cause. Instead, the Motion asserts that the government failed to establish necessity and that Defendants are entitled to a *Franks* hearing.

- 4 -

> The ultimate burden of showing the unlawfulness of an interception pursuant to an order rests upon the party against whom the fruits of the interception are offered. An interception order is presumed valid, and the burden of proving otherwise is on the challenger.

86 C.J.S. Telecommunications § 286, *footnotes omitted.*

*Title III of the Omnibus Crime Control and Safe Streets Act of 1968*

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 212 (codified at 18 U.S.C. §§ 2510–14, 2516–18, 2519, 2520, 2521–22 (2000)) ("Title III"), regulates the interception of wire, oral, and electronic communications and sets forth the procedures that must be followed to conduct electronic surveillance and requires judicial authorization for interception of wire, oral, or electronic communications in connection with the investigation of certain enumerated crimes. See 18 U.S.C. § 2516. The procedural steps provided by Title III require "strict adherence." *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir.2001), *citing United States v. Kalustian*, 529 F.2d 585 (9th Cir.1976), *internal citation omitted*

To obtain authorization for a wiretap, the government must demonstrate (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of Title 18 of the United States Code, [(b) that the communications concerning the offense will be obtained through the requested interception, and] (c) that "normal investigative techniques have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(a)-(c); *see also* 18 U.S.C. § 2518(1)(a)-(c). Immigration offenses under 8 U.S.C. § 1324(a) are covered by the wiretap statute. 18 U.S.C. § 2516(1)(m). "Normal investigative procedures would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants and the infiltration of conspiratorial groups by undercover agents or informants . . ." Senate Committee on the Judiciary, Report on the Omnibus Crime Control and Safe Streets Act of 1968, 90th

Cong., 2nd Sess. (S. Rep. 1097, April 29, 1968), notes at page 101.

*Necessity Requirement*

The necessity requirement exists "in order to limit the use of wiretaps, which are highly intrusive." *Blackmon*, 273 F.3d at 1207, *citing United States v. Bennett*, 219 F.3d 1117, 1121 (9th Cir.2000), *internal citation omitted*. Sections 2518(1)(c) and 2518(c)(3) ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. *Id.*, *citing United States v. Kahn*, 415 U.S. 143, 153 at n. 12 (1974). The necessity "requirement can be satisfied by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." *McGuire*, 307 F.3d at 1196, *citing United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986). However, if the request for authorization for a wiretap does not contain an adequate "statement" concerning the use of other investigative procedures, a warrant based upon that request is invalid and any electronic communications subsequently intercepted must be suppressed from evidence as well as any fruits of that illegally obtained evidence. *See e.g., United States v. Spanuolo*, 549 F.2d 705 (9th Cir. 1977); *United States v. Santora*, 600 F.2d 1317, 1321-22 (9th Cir. 1979).

Necessity for a wiretap is "evaluated in light of the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy." *United States v. Garcia-Villalba*, 585 F.3d 1223, 1228 (9th Cir. 2009), *citations omitted*. An "'effective case' means 'evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment.'" *Id.*, *citations omitted*. Government officials "need not exhaust every conceivable investigative technique before obtaining a wiretap." *United States v. Forrester*, 616 F.3d 929, 944 (9th Cir. 2010), *citing United States v. Commito*, 918 F.2d 95, 98-99 (9th Cir. 1990); *United States v. Carneiro*, 861 F.2d 1171, 1178 (9th Cir. 1988). Yet, the request must be specific to prevent the government from making generalized allegations about certain types of cases,

and thereby remove the necessity requirement in the particular investigation for which the wiretap is sought. *United States v. Ippolito*, 774 F.2d 1482 (9th Cir. 1985).

The sufficiency of a wiretap application, including the necessity determination, is determined solely from the information within the "four corners" of the affidavit, absent a deliberate or reckless misrepresentation or omission of a material fact in the affidavit. *United States v. Shryock*, 342 F.3d 948, 976 (9th Cir. 2003); *United States v. Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995); *Bennett*, 219 F.3d at 1124. Moreover, the necessity requirement must be independently satisfied with respect to each new individual whose conversations are to be intercepted. *United States v. Carniero*, 861 F.2d 1171, 1176-1177 (9th Cir. 1988).

*Necessity Requirement – TT-1*

In this case, the Motion to Suppress argues that an invalid wiretap authorization taints all subsequent extensions and that illegally obtained interceptions taint subsequent applications. *United States v. Giordano*, 416 U.S. 505, 533, 94 S.Ct. 1820 (1974); 18 U.S.C. § 2518(10)(a). Defendants assert that the Affidavit in support of the wiretap application is unsupported by the facts of the investigation at the time of the application. Defendants assert that, because the application contains inaccuracies or significant omissions, the Court must conduct a *Franks* hearing. *Franks v. Delaware*, 438 U.S. 154 (1978); *Bennett*, 219 F.3d at 1124 (*Franks* hearing is required if the defense makes an initial showing that the government's affidavits contained an intentional or reckless inclusion or omission, and that the inclusion or omission was material).

Defendants argue that the government likely knew that some traditional investigative techniques would not advance all of the goals of the investigation . . . and for the government to assert that its failure to do so does not establish necessity. However, this supports the use of a wiretap – the traditional methods could not, by their nature, identify other targets. Contrary to Defendants' implication, there is no requirement that the traditional methods be completely ineffective. Rather, they must be

viewed "in light of the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy." *Garcia-Villalba*, 585 F.3d at 1228. Traditional methods were not effective to obtain evidence against other persons in the conspiracy.

Defendants argue that "common sense" indicates that further traditional methods would have been reasonably likely to continue to yield valuable evidence. However, as argued by the government, "[t]he law does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope." *Bennett*, 219 F.3d 1122; *United States v. McGuire*, 307 F.3d 1192, (9th Cir. 2002) (although a wiretap should not ordinarily be the initial step in the investigation, law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap).

Defendants argue that it is not enough that (1) the traditional methods show signs of success, (2) the continued use of the traditional methods would be more cumbersome than using a wiretap, and (3) the traditional investigative techniques are expected to be exhausted by law enforcement. However, it is not simply that those techniques were too cumbersome in this case. Rather, those techniques were ineffective at identifying "higher-ups" in the conspiracy.

Defendants also argue that the affidavit does not provide any specifics as to why no source was willing or able to infiltrate the higher levels of the ASOs and does not provide why normal investigative procedures were determined to be too dangerous:

> The affidavit contains no statements supporting a finding that law enforcement had any reason to fear danger from any individuals associated with the investigation. The affidavit makes no claims of any of the individuals having a propensity for violence. The most that the affidavit states is that, due to potential undercover agents being bound by ICE policies, they might be "met with suspicion" by the target subjects. EC Disclosure, page 55, lines 9-14. Thus, the affidavit fails to show that normal investigative measures would have been too dangerous to try, failing the third prong of the § 2518(1)(c) necessity requirement. *See Gonzalez*, 412 F.3d at 1115 (finding that the Government had not shown that normal

- 8 -

investigative methods would have been too dangerous to try, under very similar facts).

Motion, p. 14. The government points out, however, that such specificity is not required:

> Defendants contend that the affidavit should have provided more detail, such as why a confidential source was considered to be in too much danger, why other confidential sources were unwilling or too scared to infiltrate the Rivera organization, and why the government chose to deport a confidential source and a source of information. However, we have not required such a level of detail in a wiretap application.

Response, p. 14, *citing Garcia-Villalba*, 585 F.3d at 1229-30, *quoting Rivera*, 527 F.3d at 899.

Moreover, Defendants argue that the government has failed to show why the government did not arrest any of the identified target subjects and then persuade them to work as informants. The government again cites to *Garcia-Villalba* for the assertion that such specificity is not required. The government also points out that the law recognizes the limited use of compromised cooperators to further the goals of an investigation. *See Canales Gomez*, 358 F.3d at 1226-27; *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000) (stating the source's "credibility would be under attack and would therefore require further corroborating evidence."). Lastly, the government points out that such a course of action would have required either the arrested persons to either continue to commit crimes or likely be met with suspicion by the target subjects.

The Court agrees with the government that such detail is not required. Rather, the Affidavit informed the reviewing judge that CIs and SOIs provided information, but were limited by the structural organization of the ASOs (the targets were extremely guarded and provided limited access to anyone outside of the managers or transportation cells).[6] In other words, the information from them was limited as to the entire scope and nature

---

[6]The affidavit submitted in support of the application for the wiretap discussed the separation of transportation cells and how this method of operation minimizes the potential damage a cooperating individual could inflict on the ASO. The affidavit also discussed how ASO leaders do not speak to the individual recruiters, guides, "load" or "stash house" operators, "load drivers," or the smuggled illegal aliens, but speak to the organizers and coordinators of each individual cell to facilitate the on-going criminal enterprise.

of the ASOs. Indeed the agents were unable to find any source willing or able to infiltrate the higher levels of the ASOs. Similarly, the use of undercover agents was limited by their inability to further the goals of the investigation because of the close-knit nature of the ASOs. *Brone*, 792 F.2d at 1506. Moreover, the experience of targets and their affiliates regarding law enforcement (e.g., former CI, former convictions) appears to have resulted in the counter-surveillance efforts by the ASOs and does not lend itself to the infiltration of the ASOs. *See e.g.,* TT-1, ¶¶ 21-22, 29 (looking into surveillance van, observing traffic).

Although the affidavit did discuss the inherent limitations of traditional investigative techniques, it also specifically included sufficient case-specific detail in its discussion of physical surveillance, CIs and SOIs, the non-prosecutions, undercover agents, pen registers and trace and trap devices, trash runs, grand jury subpoenas, search warrants and mail covers.

The affidavit contains a full and complete statement of facts and investigative history in compliance with § 2518(1)(c) if it attests that adequate investigative techniques were exhausted before the wiretap order was sought or that such methods reasonably appeared unlikely to succeed or were too dangerous. *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir.2005). The Ninth Circuit has recognized that "[a]lthough a wiretap should not be used routinely as the first step in a criminal investigation, it need not be the last resort." *United States v. Smith*, 839 F.2d 1573, 1582 (9th Cir.1990), *citing United States v. Bailey*, 607 F.2d 237, 241 (9th Cir.1979), *cert. denied*, 445 U.S. 934 (1980).

The Affidavit did not present the interpretations and conclusions as direct factual evidence; rather, the evidence supporting those interpretations and conclusions were laid out in detail . . . leaving it up to the judge to determine whether necessity had been shown. *See e.g., United States v. McCain*, 271 F.Supp.2d 1187 (N.D.Cal. 2003) (where agent submitted conclusions as facts, it did not permit magistrate to exercise independent judgment). The judge did not abuse its discretion in determining that necessity have been shown. Further, a *Franks* hearing is not warranted.

*Extension of TT-1 and Applications for TT-2, TT-3, TT-4*

Defendants asserts that the extension of TT-1 and the applications and extensions of TT-2, TT-3, and TT-4 consist largely of boilerplate and copy-pasted language from the original TT-1 wiretap application and, therefore, do not independently demonstrate necessity. Neither Defendants nor the government address these wiretaps extensively.

Defendants not only assert that TT-2 – TT-4 are invalid because they rely on TT-1, but also that they include boilerplate language and do not independently demonstrate necessity. The government's response is only slightly more specific:

> . . . Like the affidavit for TT-1 discussed above, the initial affidavit authorizing interception of TT-2 provided the issuing court with case-specific detail regarding the traditional investigative techniques used to further the goals of the investigation. The affidavit recounted the limitations of the investigative techniques, including defendant Raul Amador-Alvarado's change in his smuggling operation due to his arrest in January 2009. TT-2 Affidavit ¶ at 33. According to physical surveillance and source information, agents determined that Amador-Alvarado was operating his smuggling operations from his residence rather than at shuttle businesses. Id.
>
> Similarly, the affidavits for wire interception of TT-3 and TT-4 provided sufficient case-specific detail describing the necessity for a wiretap. The initial affidavit for wire interception over TT-3 detailed the changes in the modus operandi of the organization as a result of the continued use of traditional investigative techniques while intercepting wire communications over TT-1 and TT-2. For instance, a Tucson-based "stash house" was established to ensure alien smuggling fees were paid prior to the aliens departure to Phoenix. TT-3 Affidavit at ¶ 45. The target subjects were also keenly aware of the presence of law enforcement and notified each other of actual and suspected surveillance. TT-3 Affidavit at ¶ 46. The affidavit for TT-4 also provides details about the organizations' knowledge of law enforcement activities. For instance, the target subjects were intercepted discussing whether the Border Patrol checkpoint was operational. TT-4 Affidavit at ¶ 47.8 Consequently, the government properly asserted and the issuing court properly concluded necessity existed to tap TT-2, TT-3, and TT-4 (and their extensions) was appropriate.

Response, pp. 28-29.

The affidavits for TT-2 – TT-4 and the extensions summarized the history of the cases, prior wiretaps, developments in the case, explained how and what evidence led to each target, and what traditional investigative techniques continued to be used and why further intercepts were needed. A review of the Affidavits establish that necessity has been shown for TT-2 – TT-4 and the extensions.

*Conclusion*

Except for Arce-Padilla, Defendants do not have standing to attack TT-1. Further, necessity for the issuance of TT-1 has been shown. Moreover, Defendants have not shown a lack of necessity for TT-2 – TT-4 and, after reviewing TT-2 – TT-4 and the extensions, the Court finds necessity for the issuance of TT-2 – TT-4 and the extensions has been shown. In addition, the Court finds it is not appropriate to schedule a *Franks* hearing. *Bennett*, 219 F.3d at 1124 (*Franks* hearing is required if the defense makes an initial showing that the government's affidavits contained an intentional or reckless inclusion or omission, and that the inclusion or omission was material).

Accordingly, IT IS ORDERED:

1. The Motions to Join (Docs. 399, 400, 401, 404, 405, and 412) are GRANTED.

2. The Clerk of the Court shall terminate the Motion to Waive Page Limits (Doc. 414).

3. The Motion to Suppress Wiretap Evidence (Doc. 398) is DENIED.

DATED this 20th day of October, 2011.

_____
Cindy K. Jorgenson
United States District Judge